IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DEANA DEVINCENZO<br>ACP# 424, P.O. Box 2465<br>Harrisburg, PA 17105 | :<br>:<br>: | CIVIL ACTION |
| Plaintiff,<br>v. | :<br>:<br>: | No.: 1:24-cv-00371-SES |
| CATHERINE HERSHEY SCHOOLS FOR<br>EARLY LEARNING<br>1840 Fishburn Road<br>Hershey, PA 17033<br>and<br>MILTON HERSHEY SCHOOL<br>801 Spartin Lane<br>Hershey, PA 17033 | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | JURY TRIAL DEMANDED |
| Defendants. | :<br>: | |

**FIRST AMENDED CIVIL ACTION COMPLAINT**

Deana Devincenzo (hereinafter referred to as "Plaintiff," unless indicated otherwise) by and through her undersigned counsel, hereby avers as follows:

**INTRODUCTION**

1. Plaintiff has initiated this action to redress violations by the Catherine Hershey Schools for Early Learning and the Milton Hershey School (hereinafter collectively referred to as "Defendants") of Title VII of the Civil Rights Act of 1964 ("Title VII" - 42 U.S.C. §§ 200d *et seq.*), Section 1981 of the Civil Rights Act of 1866 ("Section 1981" – 42 U.S.C. § 1981), the Americans with Disabilities Act, as amended ("ADA" - 42 USC §§ 12101 *et. seq.*), and the Pennsylvania Human Relations Act ("PHRA").

2. This Court has original subject matter jurisdiction over the instant action pursuant to 28 U.S.C. §§ 1331 and 1343(a)(4) because it arises under the laws of the United States and seeks

1

redress for violations of federal laws. There lies future supplemental jurisdiction over Plaintiff's future state law claims because they arise out of the same common nucleus of operative facts as Plaintiff's federal claims asserted herein.

3. This Court may properly assert personal jurisdiction over Defendants because their contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendants to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945), and its progeny.

4. Pursuant to 28 U.S.C. § 1391(b)(1) an (b)(2), venue is properly laid in this district because Defendants are deemed to reside where they are subjected to personal jurisdiction, rendering Defendants residents of the Middle District of Pennsylvania.

5. Plaintiff is proceeding herein (in part) under the ADA and Title VII after properly exhausting all administrative remedies with respect to such claims by timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and by filing the instant lawsuit within ninety (90) days of receiving a notice of dismissal and/or right to sue letter from the EEOC.

## **PARTIES**

6. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

7. Plaintiff is an adult individual with an address set forth in the caption.

8. The Milton Hershey School (hereinafter individually referred to as "Defendant MHS") is a private boarding school in Hershey, Pennsylvania for K–12 students, located at the above-captioned address.

9. The Catherine Hershey Schools for Early Learning (hereinafter individually referred to as "Defendant CH"), upon information and belief, is a subsidiary of Defendant MHS, serving children from six weeks to age five, providing weekday education and care while connecting families with the resources they head, with a facility located at the above-captioned address.

10. Because of their interrelation of operations, common ownership or management, centralized control of labor relations, common ownership or financial controls, and other factors, Defendants are sufficiently interrelated and integrated in their activities, labor relations, ownership, and management that they may be treated as a single and/or joint employer for purposes of the instant action.

11. At all times relevant herein, Defendants acted by and through their agents, servants and employees, each of whom acted, at all times relevant herein, in the course and scope of their employment with and for Defendants.

## FACTUAL BACKGROUND

12. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

13. Plaintiff was employed by Defendants as a Health Services Manager for Defendant CH, from on or about September 6, 2022, until her unlawful termination (discussed further *infra*) on or about February 15, 2023.

14. Plaintiff was primarily supervised by former Director of Defendant CH, Annie Papero (Caucasian, hereinafter "Papero") and then by subsequent Director of Defendant CH, Melissa Ilski (Caucasian, hereinafter "Ilski").

15. Throughout her employment with Defendants, Plaintiff was a hard-working employee who performed her job well.

### -Race Discrimination-

16. Plaintiff is a black (African-American) female.

17. Upon information and belief, Defendant CH's workforce was primarily Caucasian, and Plaintiff was one of very few black/African American individuals working within Defendant CH, especially in a management level position.

18. During her employment with Defendants, Plaintiff witnessed and was subjected to discriminatory treatment because of her race. By way of example, but not intended to be an exhaustive list:

   a. Shortly after starting her employment with Defendants, Papero read a book during an A.M. staff meeting called *Visiting Day* by Jacqueline Woodson. *Visiting Day* is about a black child who visits her father in prison and waits for his release from the same. Many staff members, including Plaintiff, questioned why this book was read during a staff meeting and found it quite offensive;

   b. Plaintiff was not informed about and excluded from a particular December 2022 conference regarding the direction that health services would be going in for Defendants, which was of particular importance for Plaintiff's job duties; however, Plaintiff's Caucasian direct supervision was included;

   c. Plaintiff was not provided with other important information regarding certain programs or aspects of her job that other Caucasian employees were provided;

   d. Caucasian management above Plaintiff would constantly contact her subordinate (also Caucasian) with important information, updates, or questions

instead of contacting Plaintiff. The information and updates provided to Plaintiff's subordinate was information that Plaintiff needed to know in order to effectively carry out the duties of her job;

e. Plaintiff's office was initially placed on the far side of Defendant CH's building cut off from other members of Defendant CH's management, to the point where Papero would announce things that Plaintiff was completely left out of. Plaintiff was also the only member of Defendant CH's management who was required to share an office with a non-management member. When Plaintiff complained about this disparity, Papero ignored her concerns;

f. Defendant CH's Director of Enrollment Management & Family Success, Shaun Turner (Caucasian, hereinafter "Turner") treated Plaintiff in a rude and condescending way, screaming at her in a meeting with Human Resources ("HR") and Ilski, that she "[didn']t want to learn," which was patently untrue given her work ethic and contributions to Defendants. Plaintiff complained to Ilski that Turner treated her disrespectfully and unfairly "as a black woman" but her concerns went unaddressed;

g. Unlike with Plaintiff's Caucasian counterparts, Defendants' management continued to try to change the duties of Plaintiff job, including adding tasks that she was not qualified to perform (but for which she made a conscious effort to try to learn);

h. While Defendants served a marginalized population of children, Defendant CH's teachers were primarily (if not all) Caucasian. When Plaintiff expressed

concerns over not having a more diverse teaching staff, she was informed, "Well, we can't find any black talent." This comment was extremely offensive;

i. Unlike her Caucasian counterparts, Plaintiff was consistently treated in a rude and demeaning manner and her concerns regarding various issues were ignored;

j. Plaintiff learned that she was only earning approximately $5,000 more than her subordinate who was Caucasian, even though Plaintiff's experience, qualifications, degrees, and skills far surpassed hers. Plaintiff expressed concerns over this and in response, Defendants gave her a $2,500 raise;

k. Plaintiff was consistently held to a different standard when compared to her Caucasian colleagues; and

l. Management, including but not limited to Ilski, would intentionally make it appear as though Plaintiff was not doing her work by failing to forward her requested work product to the appropriate personnel, as Plaintiff was having computer problems and was not able to give it to the appropriate person. Management agreed to forward Plaintiff's work product to the appropriate personnel, but then failed to do so (making it appear that Plaintiff did not carry out certain requests made of her).

19. In addition to complaining of pay inequities (based on race) and a lack of diversity with Defendant CH's teaching staff, Plaintiff made several other complaints in advance of her termination regarding the aforesaid pattern of discriminatory behavior that she was witnessing and being subjected to within Defendants based on race.

20. Plaintiff complained of race discrimination not only to Defendant CH's management and HR department, but she also complained to Defendant MHS's HR department.

6

21. Plaintiff additionally asked that the central office be included in the discussion about her concerns regarding racial discrimination. However, Defendants' HR department[s] and management did not properly investigate or address her concerns of racial discrimination and instead, Plaintiff was provided a letter on or about December 12, 2022, indicating that her concerns of discrimination and harassment had allegedly been investigated but that no findings were made and the "investigation" into her complaints was being closed.

22. Following the aforesaid December 12, 2022 letter, Plaintiff continued to be subjected to discrimination and retaliation because of her prior complaints until she was abruptly terminated on or about February 15, 2023.

23. On or about February 15, 2023, Plaintiff was called while working from home as a result of her health conditions (discussed further *infra*) and informed that she was being separated from her employment with Defendants.

24. Plaintiff was further advised during her termination meeting that her separation was not based on misconduct but rather a "misalignment" of her role. Plaintiff was not provided with any further clarification.

25. Plaintiff was also provided a severance agreement in connection with her separation, which asked that she release any and all claims that she had against Defendants (including claims of discrimination and retaliation) in exchange for a minimal sum of money[1]; however, Plaintiff rejected this offer.

---

[1] *See Staffieri v. Northwestern Human Servs.*, 2013 U.S. Dist. LEXIS 72115 at **14-15 (E.D. Pa. 2013) (an employer who offered severance at the time of termination when policies did not require upon condition of waiving claim supported finding of pretext among other facts); *Bartlett v. NIBCO Inc.*, 2011 U.S. Dist. LEXIS 28072 (N.D. Ind. 2011) (finding that a severance agreement offered contemporaneously to when the employee was terminated was "probative on the issue of whether NIBCO's motive for terminating Bartlett was [false]."); *EEOC v. Republic Servs., Inc.*, 640 F. Supp. 2d 1267 (D. Nev. 2009) (denying summary judgment and considering as evidence in wrongful termination case that a company would offer severance when an employee is supposedly terminated in a manner that doesn't warrant severance per an explicit company policy); *Karl v. City of Mountlake Terrace*, 2011 U.S. Dist. LEXIS 59085 (W.D. Wash. 2011) (severance agreements are admissible in retaliation claims when made contemporaneous to

26. Plaintiff believes and therefore avers that she was subjected to a hostile work environment and retaliation because of her race and her objections to/complaints of race discrimination.

27. Plaintiff believes and therefore also avers that her race was a motivating/determinative factor in the termination of her employment with Defendants.

### -Disability Discrimination-

28. In addition to the discrimination and retaliation that Plaintiff was subjected to because of her race, Plaintiff was also treated unfairly as a result of her health conditions and requests for medical accommodations.

29. Plaintiff has and continues to suffer from, several ADA-qualifying disabilities, including but not limited to, anxiety and PTSD (including insomnia and panic), and associated complications/conditions.

30. At all relevant times hereto, Defendants' management was aware of Plaintiff's aforesaid disabilities, as she had discussed the same initially with Papero and then with Director of HR for Defendant CH, Beth Kroutch (Caucasian, hereinafter "Kroutch") in or about November/December of 2022.

31. As a result of her aforesaid disabilities, Plaintiff is (at times) limited in her ability to perform some daily life activities, including but not limited to, sleeping, concentrating, and working.

---

termination, as they are not governed by Fed. R. Evid. 408); *Brandy v. Maxim Healthcare Servs., Inc.*, 2012 WL 5268365, at *2 (N.D. Ind. 2012) (holding that severance agreements offered at the time of termination do not fall under Rule 408 because they are offered before a dispute arises, regardless if the employer "anticipated the severance agreement curtailing any potential future litigation.").

32. Despite her aforesaid health conditions and limitations, Plaintiff was able to perform her job duties well; however, she (at times) required some reasonable medical accommodations.

33. For example, in or about November of 2022, Plaintiff had a meeting with Kroutch wherein she discussed the toll that the hostility and animosity that she was being subjected to by Papero and others because of her race was having on her mental health. Plaintiff explained to Kroutch that she was undergoing counseling for her mental health conditions, including but not limited to taking advantage of Defendants' Employee Assistance Program ("EAP").

34. The aforementioned discriminatory and hostile work environment that Plaintiff was being subjected to on account of her race was exacerbating Plaintiff's health conditions and as a result, she needed to leave early upon occasion to attend counseling and/or therapy sessions for the same (a reasonable accommodation under the ADA). However, Plaintiff always made up the time by coming in earlier or working later on other days.

35. While continuing to suffer from flare-ups and the exacerbation of her aforesaid disabilities for the next several weeks for which she attended therapy and/or counseling appointments, Plaintiff performed her job duties well.

36. In fact, Plaintiff left early to attend one such mental health appointment on or about February 14, 2023, and requested the ability to work from home via email to Ilski due to her anxiety, on or about February 15, 2023.

37. Plaintiff was then abruptly terminated on or about February 15, 2023, ***the same day that she requested and while still utilizing reasonable medical accommodations (i.e., the ability to work from home), for completely pretextual reasons*** (set forth *supra*).

38. Defendants failed to accommodate Plaintiff by terminating her the same day that she requested and while still utilizing reasonable medical accommodations (i.e., the ability to work from home).

39. Plaintiff believes and therefore avers that she was subjected to discrimination and retaliation because of: (1) her actual/perceived/record of disabilities; (2) her requested accommodations; and (3) Defendants' failure to properly accommodate her health conditions (set forth *supra*).

40. Plaintiff believes and therefore also avers that her actual/perceived/record of disabilities was a motiving and/or determinative factor in the termination of her employment with Defendants.

**COUNT I**
**Violation of Title VII of the Civil Rights Act of 1964 ("Title VII")**
**([1] Race Discrimination; [2] Retaliation; and [3] Hostile Work Environment)**
**-Against Both Defendants-**

41. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

42. During Plaintiff's employment with Defendants, she was subjected to discrimination, retaliation, and a hostile work environment through disparate/derogatory treatment, pretextual admonishment and/or discipline, and unfair pay practices, as outlined supra because of her race.

43. Plaintiff objected to/complained of the aforementioned instances of race discrimination and disparate treatment by Defendants' management, but her concerns were ignored, and instead, Defendants' management continued to subject Plaintiff to hostility, animosity, and disparate treatment because of her race.

44. Plaintiff was then terminated on or about February 15, 2023, for completely pretextual reasons (set forth *supra*).

45. Plaintiff believes and therefore avers that she was subjected to discrimination, a hostile work environment, and retaliation because of her race and/or her complaints of race discrimination.

46. Plaintiff believes and therefore avers that her race was a motivating and/or determinative factor in Defendants' decision to terminate her employment.

47. These actions as aforesaid constitute violations of Title VII.

## COUNT II
### Violation of 42 U.S.C. Section 1981
([1] Race Discrimination; [2] Retaliation; and [3] Hostile Work Environment)
-Against Both Defendants-

48. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

49. During Plaintiff's employment with Defendants, she was subjected to discrimination, retaliation, and a hostile work environment through disparate/derogatory treatment, pretextual admonishment and/or discipline, and unfair pay practices, as outlined *supra* because of her race.

50. Plaintiff objected to/complained of the aforementioned instances of race discrimination and disparate treatment by Defendants' management, but her concerns were ignored, and instead, Defendants' management continued to subject Plaintiff to hostility, animosity, and disparate treatment because of her race.

51. Plaintiff was then terminated on or about February 15, 2023, for completely pretextual reasons (set forth *supra*).

52. Plaintiff believes and therefore avers that she was subjected to discrimination, a hostile work environment, and retaliation because of her race and/or her complaints of race discrimination.

53. Plaintiff believes and therefore that but for her race, Defendants would not have terminated her employment.

54. These actions as aforesaid constitute violations of Section 1981.

**COUNT III**
**Violations of the Americans with Disabilities Act, as Amended ("ADA")**
**([1] Actual/Perceived/Record of Disability Discrimination;**
**[2] Retaliation; and [3] Failure to Accommodate)**
**-Against Both Defendants-**

55. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

56. Plaintiff suffered from qualifying health conditions under the ADA which affected her ability (at times) to perform some daily life activities, including but not limited to normal sleeping, concentrating, and working (among other daily life activities).

57. Plaintiff kept Defendants' management informed of his serious health conditions throughout his tenure with Defendants.

58. Despite Plaintiff's aforementioned health conditions and limitations, she was still able to perform the duties of her job well with Defendants; however, Plaintiff did require reasonable accommodations at times.

59. Plaintiff requested reasonable accommodations from Defendants, including but not limited to, intermittent time off and/or the ability to leave work early for therapy/counseling appointments and the ability to work from home as needed to care for and treat for her serious health conditions.

60. Plaintiff was then abruptly terminated on or about February 15, 2023, the same day that she requested and while utilizing reasonable medical accommodations (i.e., the ability to work from home), for completely pretextual reasons (set forth *supra*).

61. Defendants failed to accommodate Plaintiff by terminating her the same day that she requested and while still utilizing reasonable medical accommodations (i.e., the ability to work from home).

62. Plaintiff believes and therefore avers that she was subjected to discrimination and retaliation because of: (1) her actual/perceived/record of disabilities; (2) her requested accommodations; and (3) Defendants' failure to properly accommodate her health conditions (set forth supra).

63. Plaintiff believes and therefore also avers that her actual/perceived/record of disabilities was a motiving and/or determinative factor in the termination of her employment with Defendants.

64. These actions as aforesaid constitute violations of the ADA.

## COUNT IV
## Violations of the Pennsylvania Human Relations Act ("PHRA")
([1] Race Discrimination; [2] Actual/Perceived/Record of Disability Discrimination; [3] Retaliation; [4] Hostile Work Environment (Race); [5] Failure to Accommodate)
-Against All Defendants-

65. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

66. Plaintiff properly exhausted her administrative remedies under the PHRA by timely filing a Charge of Discrimination with the Pennsylvania Human Relations Commission ("PHRC") and waiting at least one year since the filing to assert the instant claims.

67. The allegations set forth in Counts I, II, and III also constitute violations of the PHRA.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A. Defendants are to promulgate and adhere to a policy prohibiting discrimination and retaliation in the future against any employee(s);

B. Defendants are to compensate Plaintiff, reimburse Plaintiff, and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendants' illegal actions, including but not limited to back pay, front pay, salary, pay increases, bonuses, insurance, benefits, training, promotions, reinstatement and seniority;

C. Plaintiff is to be awarded punitive damages, as permitted by applicable law, in an amount believed by the Court or trier of fact to be appropriate to punish Defendants for their willful, deliberate, malicious and outrageous conduct and to deter Defendants or other employers from engaging in such misconduct in the future;

D. Plaintiff is to be accorded other equitable and legal relief as the Court deems just, proper and appropriate (including but not limited to damages for emotional distress, pain, suffering and humiliation); and

E. Plaintiff is to be awarded the costs and expenses of this action and reasonable attorney's fees as provided by applicable federal and state law.

F. Plaintiff is to be given a jury trial as demanded in the caption of this Complaint.

Respectfully submitted,

**KARPF, KARPF & CERUTTI, P.C.**

*/s/ Jeremy M. Cerutti*
Jeremy M. Cerutti, Esq.
Ari R. Karpf, Esq.
8 Interplex Drive
Suite 210
Feasterville-Trevose, PA 19053
215-639-0801

Date: June 28, 2024